IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THOMAS LAMAR RONE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:23-cv-154-TFM-N |
| | ) | |
| ALEX LOTT, | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the Court is *Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law* (Doc. 54, filed June 2, 2025) in which Defendant Alex Lott moves the Court enter summary judgment in his favor and against Plaintiff Thomas Lamar Rone for the claims that are brought against him. Having considered the motion for summary judgment, response, reply, and relevant law, the Court finds the motion is due to be **GRANTED**.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental). The Court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business

contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to

28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this

matter occurred in this judicial district.

No party disputes or debates the Court's jurisdiction or venue, and the Court finds adequate

support for both.

## II.   BACKGROUND

### A.   Factual Background[1,2]

---

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)). "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant." *Id*. (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Therefore, the recitation of facts here are those construed in favor of the plaintiff. "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts." *Id*.

A party is obliged to address an opposing party's assertion of fact that is presented in a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").

[2] The Court consolidated for discovery purposes the two related cases that are separately brought by Robert Rone, *Rone v. Lott*, Civ. Act. No. 1:22-cv-509-TFM-N (S.D. Ala.), and Thomas Rone, *Rone v. Lott*, Civ. Act. No. 1:23-cv-154-TFM-N (S.D. Ala.). Since the two cases share much of the same factual background, the Court will present a mostly consolidated factual background for purposes of this Memorandum Opinion and Order, but the Court omits the facts that are related solely to Robert's medical indifference claims. References to evidentiary submissions that were

On July 7, 2019, Defendant Alex Lott ("Lott") was a detective with the Mobile Police Department ("the MPD") who responded to 2496 Schillinger Road, a What-A-Burger restaurant, about a report of a male with a stab wound. Doc. 208-1 at 2, 26. The stabbing victim, Fernando Descailleaux ("Fernando"), was found in his aunt, Mariella Rone's ("Mariella"), car in the parking lot of the restaurant. *Id.* Mariella told Lott that Fernando was stabbed by her son, Thomas Lamar Rone ("Thomas"), at her residence, 9764 Norfolk Place ("the Residence"). *Id.* at 3-4, 26. Robert Earl Rone ("Robert") is an attorney in Mobile, Alabama, who practices law in the areas of immigration, criminal defense, family law, and tort claims, and is Thomas' father. Doc. 208-2 at 5.

In a "Victim/Witness Statement Form" that Mariella prepared on July 7, 2019, at 5:13 PM, she described the circumstances of when Fernando was stabbed:

> I came to Tommy's room and told Lauren (his girlfriend) that he won't have visitors today. I was talking to my son Tommy and let him know I got the fuel (ethanol free gas) so he can cut the yard with Fernando my nephew. Tommy was upset about us making [him] read a book that his high school (Baker Highschool) required. Told him to help Fernando with the yard today Sunday. Tommy said yesterday he was going to help but he decided he was not. Started to be disrespectful and my nephew was telling him to respect me, then they both talk back and forth. Tommy doesn't understand we all have responsibilities and a bad attitude won't take him anywhere. Fernando was telling him to respect me and all of a sudden they started to punch each other. I tried to separate them finally Fernando left Tommy's room. Tommy went fast to the kitchen and heard something drop [on] the floor and saw him with a knife and told my nephew Fernando to be careful he has a knife and Tommy went to the bathroom and stabbed him and left the house with Lauren Butts ["Butts"].

Doc. 208-3 at 6.

---

filed in support or opposition to the motions for summary judgment that were filed in *Rone v. Lott*, Civ. Act. No. 1:22-cv-509-TFM-N (S.D. Ala.), will not have an identifier precede the referenced document, while the evidentiary submissions that were filed in support or opposition to the motion for summary judgment that were filed in *Rone v. Lott*, Civ. Act. No. 1:23-cv-154-TFM-N (S.D. Ala.), will be identified with "*Thomas Case*" before the referenced document.

After the stabbing, Butts drove Thomas in her vehicle, first, to a friend's house then to her grandmother's house. Doc. 208-1 at 27. Lott spoke with Robert via telephone, and Robert told Lott he advised Butts that Thomas needed to turn himself in to the police. *Id.* at 26. Robert's call to Butts occurred at 2:53 PM according to Lott's report. *Id.* Butts told Robert that she and Thomas would not return to the Residence at that time and would, instead, drive around then hung up on the call. *Id.* Butts later told Robert she would bring Thomas home at a later time. *Id.* Lott then searched for Butts' vehicle, which he observed at 4:50 PM. *Id.* at 27. Lott performed a traffic stop on Butts' vehicle, and both Butts and Thomas were taken into custody then transported to the MPD headquarters to be questioned. *Id.*

Lott interviewed Thomas, who, according to Lott's report, stated:

Thomas told me that [Butts] came over earlier in the day without his parent's knowledge. Thomas said he was playing a video game and was cursing at the TV when he heard his mom come in the house. Thomas said he delayed cutting the grass and reading his book multiple times. Thomas said his mom came in his room and told [Butts] to leave. Thomas said his mom told him to go outside and cut the grass, but they began to argue. Thomas said Fernando came in the room and told him to stop cursing at his mother. Thomas said Fernando punched him first when the fight started. Thomas said he was able to get away from Fernando and go into the kitchen to get a knife. Thomas said he took a silver knife from the knife block and stabbed Fernando in the chest with it. Thomas said he ran out of the house and got into [Butts'] car. Thomas said [Butts] took him to a friend's house before driving to her grandmother's house on Bellingrath Road.

*Id.*

Lott interviewed Butts, who, according to Lott's report, stated:

[Butts] told me she went to Thomas's house even though she knew Thomas was grounded by his parents. [Butts] said she was in Thomas's room watching him play a video game when his mom came in the room. [Butts] said Mariella told her to leave when Thomas became upset and argue[d] with his mother. [Butts] said Fernando came into the room and told Thomas to stop arguing with Mariella. [Butts] said when Thomas and Fernando started fighting she left the room and waited by the front door. [Butts] said when Thomas fights with his family, he always leaves with her. [Butts] said she heard Mariella scream, "Thomas has a knife." [Butts] said Mariella told her to call [Robert] (at the store) and tell him to come home.

[Butts] said she called [Robert] and the left the [R]esidence. [Butts] said Thomas came outside and told her to leave. [Butts] said they went [to] a neighbor's house so Thomas could clean the blood off of him and then to her grandmother's house. [Butts] said that [Robert] called her phone repeatedly, but Thomas rejected them each time. [Butts] said she was texting [Robert] and arguing with him about the incident. [Butts] admitted that she knew [ ] that Thomas stabbed Fernando and that he was wanted by the police. [Butts] said that she knew she needed to go back to the [R]esidence, but she was scared and was trying to help Thomas. [Butts] acknowledged that she should not have waited the length of time to bring Thomas back. The time lapse between [Butts] leaving with Thomas to the time both were arrested in the neighborhood was 1310-1650 hours (3 hours and 40 minutes).

*Id.*

During Butts' interview, Lott noted in his report:

While speaking to [Butts], I observed multiple bruises on her arms, legs, as well as a black eye. [Butts] told me that Thomas hits her repeatedly and said that he has a severe anger problem. [Butts] declined to press charges for domestic violence.

*Id.*

As a result of the events of July 7, 2019, Butts was charged with hindering prosecution and ultimately pled guilty but was granted youthful offender status. Doc. 208-4 at 9-10. Thomas was charged with assault, first degree. Doc. 208-1 at 28. Amanda Herren ("Herren"), an assistant district attorney ("ADA") for Mobile County, Alabama District Attorney's Office ("DA's Office") at the time, was assigned as the prosecutor for Thomas' assault charge and managed the case from arraignment until September 2021, when she left the DA's Office. Doc. 208-7 at 2-4. Lott was the investigative detective for Thomas' assault charge. Doc. 208-1 at 7-8. The Honorable Ben H. Brooks was the circuit court judge to whose docket the assault case was assigned (*see* Doc. 208-5), and the matter was ultimately tried, and he was found not guilty (Doc. 134 at 8).

On May 3, 2021, while Thomas' assault case was pending, Herren was contacted by Zachary Isaiah Roberts ("Isaiah") who, at the time, was in a relationship with Butts. *Id.* at 9; Doc. 208-7 at 6-8. Herren had unsuccessfully attempted to contact Butts, a fact of which Isaiah was

aware, and he provided Herren with information as to where Butts lived and provided an accurate phone number to contact her. Doc. 208-7 at 8.

Herren then arranged to meet with Butts to prepare her, as a potential witness, for an immunity hearing in Thomas' then pending assault case. *Id.* at 17-18. The immunity hearing was based on the argument that Thomas acted in self-defense *Id.* at 20. Herren coordinated with Lott for him to transport her to the meeting with Butts. *Id.* at 17-18. Herren's meeting with Butts occurred at Butts' grandmother's home. *Id.* at 19-20. During the meeting, Herren asked Butts questions related to the assault case while Lott took notes of the conversation. *Id.* at 23-24. Herren did not recall Lott asked any questions. *Id.* at 24.

During the meeting, Lott believed Butts to be credible. Doc. 208-1 at 13. Lott produced a report of Herren's meeting with Butts. *Id.* at 12. Lott's report reads as follows:

> On 05/03/21, I was notified by [ ] Butts (19 YOA) that her ex-boyfriend, Thomas [ ] (19 YOA), was threatening her in reference [to] an ongoing criminal case (M219-07-00826).
>
> On 05/04/21, I met with [Butts] at her residence (5781 Plantation Woods Drive). ADA [ ] Herren was also present at that time. [Butts] said she continued her relationship with Thomas after the [sic] she was put on probation from the previous case. [Butts] said she went to Thomas' residence after a court proceeding in March 2020. [Butts] said she was in the bathroom when Thomas and his father, Robert [ ], cornered her while video recording the encounter. [Butts] said both of them questioned her about what she was going to say when she testified in court. [Butts] said they told her to say that Thomas was putting his pants on when Fernando attacked him again, causing Thomas to act in [s]elf defense. [Butts] said Robert continued to record her until they left her alone. [Butts] said Robert has observed Thomas physically abusing her in the past and has done nothing to stop Thomas or help her.
>
> [Butts] said in the past week, she went to a friend's residence at 9316 Maplewood Drive and was unaware Thomas was going to be there. [Butts] said she was sitting on the couch texting her current boyfriend while Thomas was standing behind her. [Butts] said Thomas began making comments about leaving her current boyfriend and blocking him on social media so they could get back together. [Butts] said Thomas grabbed her hair and pulled her across the couch to him. [Butts] said she was able to get away from him and leave the residence. [Butts] said Thomas called

her later that night and in the week saying, "I'll beat the fuck out of you, you better not switch up on me, you better not snitch on me." [Butts] said Thomas was saying these things because of her involvement with his case and testifying against him.

[Butts] told me she was afraid of Thomas because of his past actions, abuse, and continued threats. [Butts] said she made three reports about past abuse (M220-06-00293, M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, M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) but, she did not want to move forward with them due to Thomas threatening to hurt her and her family. [Butts] said Thomas knows where each of her family members live and is afraid Thomas will retaliate against her. [Butts] said she can not block Thomas' phone number because he uses a phone application that appears as a different number each time he contacts her. [Butts] also expressed interest in obtaining a protection from abuse order.

*Id.* at 37.

Butts, Herren, and Robert clarified certain portions of Lott's incident report during each of their depositions in this matter. *See* Doc. 208-4, Doc. 208-7, Doc. 231-4. Butts states, while she was in the bathroom and questioned by Robert and Thomas, they did not ask her, "what I was going to say in court, I never said that." *Id.* at 20. Butts states:

I never even went into detail about like the things that we were talking about. I just said we were in there [, the bathroom,] and he was asking me questions about court. I didn't say about what I testified or what I was going to say in court. I just said about court. . . . I said that we were in the bathroom and he questioned us about court and was recording me - - recording us talking.

*Id.* Herren states:

I remember [Butts] saying she was in the restroom, and Thomas and [Robert] entered the restroom, and she did not feel like she could get out, and they were asking her what she was going to testify to at a future hearing.

. . .

I don't have a specific memory of the word "corner."

Doc. 208-7 at 26. Robert states the bathroom incident occurred in September 2020, not in March as stated in Lott's report. *Compare* Doc. 231-4 at 27-28 *with* Doc. 208-1 at 37.

As to the incident report statement that Robert and Thomas told Butts to say Thomas was putting on pants when Fernando attacked him, Butts states:

> That - - I never said that.  Because I couldn't have even said that because I didn't even see what happened like in the whole incident.  I was outside of the room.  There was no way that I could have said that.
>
> I told Lott that, out of my knowledge, that that's what I knew he was doing, was going to put pants on.  I didn't say that's what they told me to say.  I told him he was going back there to put pants on because he had no pants on.
>
> . . .
>
> Because once he did go back to put his pants on, that's when it happened.  But I didn't see that.  And I just told Lott he was going back to put his pants on, and this is how it came out.  I don't know how.
>
> But basically I didn't say any of this.

Doc. 208-4 at 21-22.

As to the circumstances of when Robert stopped recording Butts in the bathroom, Butts

states:

> So after we had talked about like court or whatever we were talking about in the video, he ended the recording and walked away.
>
> . . .
>
> So I must have said like when we were done talking, he walked away and ended the recording.  But that's how I knew he was recording because like I just seen him turn it off.  But I don't know - - the continued recording until they left me alone, they weren't really bothering me.

*Id.* at 22-23.

As to whether Robert observed Thomas abuse Butts and not take action to help her, Butts

states:

> Robert has seen Tommy put his hands on me.  He was actually on top of me choking me, and him and Mally walked in.  And it was like:  Get off of him or something or stop or whatever.
>
> But I'm like:  I'm not on him, he's on me.
>
> But yeah, that's accurate.  But not the "nothing to stop or help" because they did say stop.

*Id.* at 23-24.

>    As to the whether Butts expected Thomas to be at the Maplewood Drive home, Butts states:
>
>    Yeah.  That's not right.  Because I rode with Tommy there.
>    . . .
>    We met at the Walmart and then got in his car, and we rode together there.
>    . . .
>    No, no.  I told them we went there together.  Obviously I knew he was there.

*Id.* at 24-25.

>    As to Thomas' actions while at the Maplewood Drive home, Butts states:
>
>    At this point he's like coming up in front to sit next to me.  And this is when he grabs me up.
>
>    I don't know how to describe Tommy, but he's just like rough.  He grabbed me up and was like:  You need to leave him, whatever.
>
>    It was kind of like an argument, but it wasn't like a full-blown argument.  We didn't get like really physical.  It was just like he grabbed me up because he saw me texting him.
>
>    . . .
>
>    [L]ike there was no hair pulling.  There was no snatching across the couch to him.  It was like he grabbed me up, just myself, my shoulders, me.
>
>    . . .
>
>    [W]e left together, but we quit arguing.  Like it calmed down and we got away from each other for a minute.  He went outside with his friend.  And I had to ride home with him.  Well, he had to take me to my car.

*Id.* at 26-27.

>    As to Thomas' communications with Butts after the events at the Maplewood Drive home

that were described in the report--"I'll beat the fuck out of you, you better not switch up on me,

you better not snitch on me"--Butts states:

>    That's accurate.  Not the "snitch" part.  But the "switch up," he called and texted and called.  But this was all in relation to the Isaiah situation because we had

discussed like he wanted to get back together.  And I was like considering it but not really.  And it was more like don't switch, my words, of us getting back together.

*Id.* at 27-28.

As to reports of past abuse of Butts by Thomas, Butts states, "I feel like I called once.  My Mom was the other two.  I was with my mom - - one of them I was with my mom, one my mom was by herself, and then one I called like by myself." *Id.* at 30.

As to threats made by Thomas against Butts and her family because of the reports made against him, Butts states, "I didn't want to move forward because of this.  But also that.  Because that's true.  He would threaten us." *Id.*

Once the DA's Office receives an officer's report, it may issue a charging document, refuse to prosecute, or request the officer conduct further investigation, among other options.  Doc. 208-7 at 33-34.  After Herren reviewed Lott's report, she approved a warrant for Thomas for intimidating a witness.  *Id.* at 28.  Lott submitted his incident report to the charging office at the DA's office, which prepares charging documents, and ADA Bren McMaken, who was in charge of that office, took the file to the district attorney, Keith Blackwood, who approved a warrant for Robert's arrest for the charge of intimidating a witness.  Doc. 208-1 at 21-22, 61; Doc. 208-7 at 22, 29, 37.  The charging office also prepared a charging document for Thomas that identified two (2) offenses: domestic violence, second degree for intimidating a witness, a felony, and domestic violence, third degree, for harassment, a misdemeanor.  *Thomas Case*, Doc. 54-2 at 34.

After the charging documents for Robert and Thomas were approved, on May 5, 2021, Lott took the documents to Magistrate Shelly Lee.  Doc. 208-1 at 17-20, 23-25, 57.  Separate complaints for Robert and Thomas were prepared in the magistrate's office, and Magistrate Lee signed the complaint and warrants for Robert and Thomas' arrests on the same date.  Doc. 208-1 at 57-58; Doc. 208-7 at 21; *Thomas Case*, Doc. 54-2 at 29, 33.  For each of the warrants for Robert and

Thomas, Lott was the sworn complaining witness.  Doc. 208-1 at 57; *Thomas Case*, Doc. 54-2 at

29, 33.

The complaint against Robert reads:

> BETWEEN 3/1/21 & 3/31/21, ATTEMPT BY USE OF A THREAT DIRECTED
> TO LAUREN OLIVIA BUTTS, A WITNESS OR A PERSON HE BELIEVED
> WOULD BE CALLED AS A WITNESS IN AN OFFICIAL PROCEEDING, TO-
> WIT: AN IMMUNITY HEARING ON 5/11/21,
> TO CORRUPTLY INFLUENCE THE TESTIMONY OF THAT PERSON,
> INDUCE THAT PERSON TO AVOID LEGAL PROCESS SUMMONING
> HIM/HER TO TESTIFY OR INDUCE THAT PERSON TO ABSENT HIMSELF
> FROM AN OFFICIAL PROCEEDING TO WHICH HE/SHE HAD BEEN
> ELGALLY SUMMONED,
> IN VIOLATION OF 13A-010-123 OF THE CODE OF ALABAMA, AGAINST
> THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

Doc. 208-1 at 57.

The complaint against Thomas for the felony offense of domestic violence, second

degree, for intimidating a witness reads:

> ON OR ABOUT 4/25-5/1/21, THOMAS RONE COMMITTED THE CRIME OF
> INTIMIDATING A WITNESS PURSUANT TO SECTION 13A-10-123, TO-WIT:
> THOMAS RONE THREATENED WHITNESS [sic] LAUREN OLIVIA BUTTS
> BY CALLING HER AND SAID "IF YOU TESTIFY, I WILL BEAT THE FUCK
> OUT OF YOU",
> WITH THE VICTIM BEING THE DEFENDANT'S EX-GIRLFRIEND,
> IN VIOLATION OF
> SECTION 13A-6-131, CODE OF ALABAMA 1975.
> IN VIOLATION OF 13A-006-131 OF THE CODE OF ALABAMA
> AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

*Thomas Case*, Doc. 54-2 at 33.

The complaint against Thomas for the misdemeanor offense of domestic violence, third

degree, for harassment reads:

> ON OR ABOUT 4/25-5/1/21, COMMIT THE CRIME OF HARASSMENT
> (SECTION 13A-011-008(A), CODE OF ALABAMA [(]1975), WITH INTENT
> TO HARASS, ANNOY OR ALARM ANOTHER PERSON, TO-WIT: LAUREN
> OLIVIA BUTTS:
>   (X)   STRIKE, SHOVE, KICK OR OTHERWISE TOUCH ANOTHER

> PERSON, TO-WIT: LAUREN BUTTS, OR SUBJECT THEM TO
> PHYSICAL CONTACT, TO-WIT: GRABBED THE VICTIM BY
> THE HAIR OF HER HEAD AND PULLED HER FROM ONE
> SIDE OF THE COUCH TO THE OTHER SIDE;
> WITH THE VICTIM BEING THE DEFENDANT'S EX-GIRLFRIEND.
> IN VIOLATION OF 13A-006-132 OF THE CODE OF ALABAMA,
> AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

*Id.* at 29.

On May 7, 2021, at approximately 12:49 PM, both Robert and Thomas were arrested at the Residence then transported to the Mobile County Metro Jail ("MCMJ"). Doc. 208-2 at 26; *Thomas Case*, Doc. 54-2 at 28. While Robert was at the MCMJ, he experienced a medical incident and was taken to the hospital by ambulance. Robert was later discharged by the hospital to the custody of the MPD then returned to the MCMJ. Doc. 205-9 at 76, 94, 153. After Rober returned to the MCMJ, he was placed in a holding cell, where he remained for approximately thirty (30) minutes to one (1) hour before his wife posted his band and he was released. *Id.* at 77.

On June 17, 2021, the complaint against Robert for intimidating a witness and the complaint against Thomas for domestic violence, second degree, for intimidating a witness came before Judge Hardesty of the District Court of Mobile County, Alabama, for a preliminary hearing. Doc. 208-6. During the preliminary hearing, counsel for Robert played an excerpt of the recording of the bathroom conversation between Robert, Thomas, and Butts, which was transcribed as follows in relevant part:

| | |
|---|---|
| MR. ROBERT RONE: | Did you ever tell - - Tommy, did you ever tell the police anything? Did you talk to them, say what happened, anything? |
| MR. THOMAS RONE: | Yeah. |
| MR. ROBERT RONE: | What'd you tell them? |
| MR. THOMAS RONE: | That I got my ass whooped. |
| MR. ROBERT RONE: | And what'd you tell them about the sticking? |
| MR. THOMAS RONE: | Huh? |
| MR. ROBERT RONE: | What'd you tell them about the stabbing? |
| MR. THOMAS RONE: | I was just like after, like, I got my ass whooped, I was |

|                    | walking in the living room. And, like, I wasn't even walking. I was like I was just in the living room. I was walking out to the door and I went to the kitchen. And, then, I didn't have no clothes on. I went back here. |
|--------------------|---|
| MR. ROBERT RONE:   | And you told them all that? |
| MR. THOMAS RONE:   | I don't remember what I told him, to be honest. |
| MR. ROBERT RONE:   | But you didn't tell him you were trying to stick him or anything? |
| MR. THOMAS RONE:   | No. Hell, no. |
| MR. ROBERT RONE:   | Did you tell them anything? |
| MS. BUTTS:         | Huh-uh. By the time that they already questioned him, they were already in my face saying, "Well, this is what," dih, dih, dih, dih, dih. I was like, "Well" - - |
| MR. ROBERT RONE:   | Did you say - - did you say the officer kept trying to getting you to say Tommy beat on you? |
| MS. BUTTS:         | Huh-uh. |
| MR. ROBERT RONE:   | I thought you told me that a couple weeks ago. |
| MS. BUTTS:         | What do you mean? |
| MR. ROBERT RONE:   | You said he kept trying to get you to say that Tommy beat you up or something. |
| MS. BUTTS:         | Oh, yeah. I thought you meant did I say that to them. |
| MR. ROBERT RONE:   | Oh. |
| MS. BUTTS:         | And I was like, no. |
| MR. ROBERT RONE:   | But you never told them that he did? |
| MS. BUTTS:         | Huh-uh. I didn't say - - tell anybody that they were making me do that - - |
| MR. ROBERT RONE:   | Yeah. You said he kept saying several - - |
| MS. BUTTS:         | Or telling me, but they were. |
| MR. ROBERT RONE:   | Yeah. You said several times he was trying to get you to say that Tommy did. |
| MS. BUTTS:         | They were. They were like, "He said y'all aren't even together," like trying to make me mad at him. |
| MR. THOMAS RONE:   | Oh, I didn't even say that. |
| MS. BUTTS:         | Yeah. No. They were like, "He said y'all are just friends and he don't - - " |

. . .

|            |   |
|------------|---|
| MS. BUTTS: | - - and he doesn't even want you, dih, dih, dih, trying to make me say something about, like - - They were just telling me - - they were like, "So he did that to your eye?" I was, like, "No." "So he did that to your eye." They kept, like, on and on and on. |

| | |
|---|---|
| MR. ROBERT RONE: | Did you have some bruises? |
| MS. BUTTS: | I had a black eye, so that's why they assumed that it was - - |
| MR. THOMAS RONE: | The black eye that she had had is when I threw something at her and she - - it hit her. |
| MS. BUTTS: | So when I got arrested and went in, I had the black eye, so they automatically assumed, like, he did that to her. |
| MR. ROBERT RONE: | But was that an accident? |
| MR. THOMAS RONE: | Yeah, it was an accident. |
| MS. BUTTS: | Yeah.  It was when we were at a party. |
| MR. ROBERT RONE: | Oh.  So he didn't beat you up.  It was just an accident. |
| MS. BUTTS: | It was like way - - no.  It was way before, like . . ." |

Doc. 208-1 at 48-49.

After the recording was played, Butts testified as to the bathroom conversation, "I just felt scared, like I had to lie. . . . Because [Robert] was asking me if I had told the cops anything, and I was saying no."  *Id.* at 2.  Butts testified she felt intimidated and wanted to tell Robert what she believed he wanted to hear but stated he did not either threaten her with physical harm or physically injure her.  *Id.* at 3.  Butts felt like she "had to lie or say what they would want me to say or I'd get hurt, not by [Robert] but Thomas."  *Id.* at 7.  Butts characterized the incident as being confined by Robert and Thomas because they were in the doorway of the bathroom.  *Id.* at 4.  Butts confirmed Robert and Thomas wanted her to report Thomas stabbed Fernando in self-defense.  *Id.* at 10.  As to whether Thomas told Butts, "I'll beat the fuck out of you, you better not switch up on me, you better not snitch on me," she confirmed the statement was made and stated he said it multiple times.  *Id.* at 51.  Ultimately, Judge Hardesty determined there was not probable cause to support Robert's charge of intimidating a witness.  *Id.* at 11.  However, Judge Hardesty found probable cause to support Thomas' charges of domestic violence, second degree, for intimidating a witness and bound the case to a grand jury for further action.  *Thomas Case*, Doc. 54-2 at 53.

On the same date, Butts filed, under penalty of perjury, a "Petition for Protection From

Abuse" ("PFA") against Thomas. *Thomas Case*, Doc. 54-1 at 45-50. In response to the prompt "Describe how the Defendant [,Thomas,] hurt or threatened the Plaintiff [,Butts,] or how the Plaintiff is in imminent danger of becoming a victim," Butts detailed:

> [G]rabbed me by the hair and pulled me to where I couldn't get away from him while threatening to "beat the fuck out of me" . . . (continued)
> . . .
> Because he saw a guy he didn't like text me.
> Throughout our 4 year relationship these are some things he has done:
>    - I went to pick him up from a party and he was drunk and didn't want to leave, so he grabbed my hair and threw me against the wall, where I fell onto the floor.
>    - Our first case we were involved in we had just gotten home from a court date where he was under the impression I told on him he hit me in my head and I was able to lock myself in a room away from him. He proceeded to break the door and throw it on my chest/neck and [I] was unable to breathe until the last minute then he took it off.
>    - We were at a party and a guy mentioned to [T]ommy that I had spoke to him earlier that night. [H]e got mad and shoved me on the ground where I hit my head and then he threw a full beer can at my eye causing me to have a black eye.
>    - [M]y black eye had just recently healed and we were on the way home from the store and he got mad and tried speeding up saying he was going to kill us then punched the mirror off the car and gave me a second [b]lack eye with it.
>    - [L]eaving a party with friends where I later found out him and his friend did cocaine, he got mad for me driving the car and punched the side of my head over and over until I almost black out, I had a concussion and a giant knot on my head for weeks.
>    - Pulled a firearm at me multiple times, after telling him repeatedly I was uncomfortable and scared of him doing that.

*Id.* at 46-47. In response to the prompt "I genuinely fear the Defendant will cause further abuse because," Butts detailed, "[H]e has pulled firearms on me and I have been seriously injured by him multiple times. I am scared if given the opportunity he would harm me again." *Id.* at 46.

Thomas' misdemeanor charge of domestic violence, third degree, for harassment was dismissed on August 26, 2021, and his felony charge of domestic violence, second degree, for intimidating a witness was *nol prossed* on August 15, 2022. *Thomas Case*, Doc. 64-3 at 19, 21.

**B.**     **Procedural Background[3]**

Thomas filed his Complaint in this matter on May 1, 2023, in which he brings two Counts against Lott: (1) malicious prosecution in violation of the Fourth Amendment and (2) outrage/intentional infliction of emotional distress in violation of Alabama law.[4] Doc. 1. Lott filed an answer to the Complaint on June 5, 2023. Doc. 5.

On September 16, 2024, Lott filed an Unopposed Motion to Consolidate in which he requested the Court consolidate, pursuant to Fed. R. Civ. P. 42(a), this matter with a related action before the Court, *Rone v. Lott*, Civ. Act. No. 1:22-cv-509-TFM-N (S.D. Ala.) ("the *Robert Case* "), for discovery purposes. Doc. 33. An identical motion was filed by Lott in the *Robert Case*. Civ. Act. No. 1:22-cv-509-TFM-N, Doc. 109. The Court granted the motions in the separate cases, ordered any non-discovery motions that pertain to an individual case should be filed in the original case, and referred the issue of an amended scheduling order to the Magistrate Judge. Doc. 34; *Robert Case*, Doc. 110.

On June 2, 2025, Lott filed a motion for summary judgment (Doc. 54) and evidentiary material (Doc. 55) in support of the motion. Thomas timely filed a response to the motion for summary judgment (Doc. 65) and evidentiary material (Doc. 64) in support of the response, and Lott timely filed a reply to the motion (Doc. 66). The motion for summary judgment is, therefore, ripe for review, and the Court finds unnecessary oral argument to address the motion.

---

[3] While docket entry citations for this matter were referenced in the "Factual Background" with the identifier "*Thomas Case*," subsequent docket entry citations in this Memorandum Opinion and Order for this matter will no longer have the identifier precede the docket entry.

[4] Robert originally represented Thomas in this matter. However, Lott filed a motion to disqualify (Doc. 9) that the Court granted, and Robert was disqualified as lead counsel in this matter but allowed him to participate as pretrial counsel. Doc. 28, 30. After the ruling on the motion to disqualify, attorney Mike Newton appeared as counsel for Thomas. Doc. 29. Thereafter, Robert continued to participate in pretrial matters, including filing Thomas' briefing for the motion for summary.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R. CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[5]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id.*

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence

---

[5] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."   11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(e)(1). The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for

discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56€, the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.   DISCUSSION AND ANALYSIS

In the motion for summary judgment, Lott makes several arguments: (1) he is entitled to absolute prosecutorial immunity because his role during the relevant events was intertwined with Herren's prosecutorial role; (2) even if he is not entitled to absolute prosecutorial immunity, he is entitled to qualified immunity because Thomas cannot show Lott either instituted or continued Thomas' criminal prosecution, Lott did not have arguable probable cause to submit the report to the DA's Office and sign the complaint against Thomas, Lott violated a clearly established right, or malice by Lott; and (3) the facts of this matter cannot support a claim for outrage, a cause of action that is recognized in only limited instances.  Doc. 54.

In response to Lott's motion for summary judgment, as to Lott's first argument, Thomas argues Lott is not entitled to absolute prosecutorial immunity because Lott performed an investigative function when he assisted Herren with the interview of Butts, served as a complaining witness in support of the warrant for Thomas, and provided false statements in support of the warrant.  Doc. 65 at 23-28.

As to Lott's second argument, Thomas argues Lott is not entitled to qualified immunity.

*Id.* at 28-36.  Thomas does not dispute Lott acted within his discretionary authority when he performed the relevant acts in this matter.  *Id.*  Thomas argues Lott instituted and continued a criminal prosecution against him because, to secure the warrant for Thomas, he provided false information.  *Id.* at 30.  Thomas also argues Lott did not investigate Butts' interview statements and provided false allegations to the magistrate judge.  *Id.*  As to malice, Thomas argues Butts disputes many of the statements that were attributed to her in Lott's report of her interview and Herren was unable to corroborate several of the statements in the report.  *Id.* at 31-32.  Further, Thomas argues his and Robert's arrests shortly before Thomas' immunity hearing support a finding of malice.  *Id*.  As to probable cause, Thomas argues Butts disputes many of the statements that are attributed to her in Lott's report and Herren was unable to corroborate several of the statements in the report.  *Id.* at 32-36.  Further, Thomas argues Lott failed to conduct a reasonable investigation to establish probable cause.  *Id.* at 36.

As to Lott's third argument, Thomas argues his outrage claim presents distinct legal issues from a Fourth Amendment reasonableness determination and he has sufficiently supported his claim.  *Id.* at 37.

A.   **Federal Claims**

1.   **Absolute Prosecutorial Immunity**

In civil cases that are brought pursuant to 42 U.S.C. § 1983, "prosecutors have absolute immunity for all activities that are intimately associated with the judicial phase of the criminal process."  *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010) (citations and internal quotation marks omitted).  The Supreme Court employs a "functional approach" to determine whether an individual is entitled to absolute prosecutorial immunity.  *Kassa v. Fulton County*, 40 F. 4th 1289, 1292 (11th Cir. 2022) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).  This fact-specific inquiry

"looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citation and internal quotation marks omitted); *see also Kassa*, 40 F.4th at 1294 (explaining the functional approach "look[s] at whether immunity is justified for the specific function in question). Those who assert absolute prosecutorial immunity's shield bear the burden of establishing its application based on the function(s) in question. *Burns*, 500 U.S. at 486 (citation omitted).

Absolute immunity applies to a prosecutor's activities "in initiating a prosecution and in present the State's case." *Rehberg*, 611 F.3d at 837 (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). Stated differently, immunity will apply for "acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the state." *Kassa*, 40 F.4th at 1293 (citation omitted). Prosecutors have been found to be immune for the initiation or continuation of a prosecution, appearances before grand juries or other judicial proceedings, the examination of witnesses and presentation of evidence. *See id.*, 611 F.3d at 837-38. However, absolute prosecutorial immunity is not limited to conduct inside the courtroom and typically applies to "preparation for those activities, including the evaluation of evidence and information." *Ward v. Chafin*, Civ. Act. 2023 U.S. App. LEXIS 7326, at *6 (11th Cir. 2023); *see also Buckley*, 509 U.S. at 273 (noting application of immunity to "the professional evaluation of evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made."). The Eleventh Circuit has extended absolute immunity to prosecutors for "filing an information without investigation, filing charges without jurisdiction, filing a baseless detainer, offering perjured testimony, suppressing exculpatory evidence, refusing to investigate complaints about the prison system, and threatening further criminal prosecutions." *Kassa*, 40 F.4th at 1293 (citations omitted).

However, if a prosecutor performs functions that are not associated with their role "as an advocate for the state," only qualified immunity is available. *Hart v. Hodges*, 587 F.3d 1288, 1295 (11th Cir. 2009) (citations omitted). For example, absolute immunity does not attach when prosecutors engage in certain investigative or administrative functions. *Hoffman v. Off. of the State Atty.*, 793 F. App'x 945, 950 (11th Cir. 2019) (citations omitted); *see also Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) ("A prosecutor functions as an investigator when he searches for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.") (citation and internal punctuation marks omitted)); *Rehberg*, 611 F.3d at 842 ("A prosecutor loses the cloak of absolute immunity by stepping out of his role as an advocate and performing 'investigative' functions more commonly performed by law enforcement officers." (citation omitted)). Prosecutorial immunity also does not attach when an officer gives advice to police during a criminal investigation, when a prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness. *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (compiling cases).

The cases to which Lott cites in which an investigator was extended absolute prosecutorial immunity involve investigators who were employed by district attorneys' offices as opposed to, in this case, an investigator who was employed by the local police department and aided an ADA with a witness interview. *See Gardner v. Bottoms*, Civ. Act. No. 23-12772, 2025 U.S. App. LEXIS 5823, 2025 WL 799282 (11th Cir. Mar. 13, 2025); *Norton v. Liddel*, 620 F.2d 1375 (10th Cir. 1980); *Atkins v. Lanning*, 556 F.2d 485 (10th Cir. 1977); *Waits v. McGowan*, 516 F.2d 203 (3rd Cir. 1975); *Garza v. Guerra*, Civ. Act. No. B-08-084, 2009 U.S. Dist. LEXIS 3304, 2009 WL 136022 (S.D. Tex. Jan. 20, 2009); *Slaughter v. City of Philadelphia*, Civ. Act. No. 94-2329, 1995 U.S. Dist. LEXIS 227, 1995 WL 12060 (E.D. Penn. Jan. 12, 1995); *see also Files v. King*, Civ.

Act. No. 1:17-cv-1632-KOB-HNJ, 2018 U.S. Dist. LEXIS 154737 (N.D. Ala. July 31, 2018) (holding same that D.A.'s investigator also entitled to absolutely immunity for acts done within the prosecutorial role and citing several of the above cases). The Court first finds that none of these cases are binding even as to the holding asserted, but do constitute persuasive authority. Regardless, that is not the situation at hand.

Lott does not cite to any authority (binding or otherwise) that extends absolute prosecutorial immunity to a law enforcement officer that was not directly employed by a district attorney's office and aids a prosecutor in their role as such, and in any case, absolute prosecutorial immunity does not attach when an officer acts as a complaining witness, and personally attests to the truth of the allegations that support a warrant, as Lott did for the warrants in this matter. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) ("We have held that absolute immunity does not apply when a prosecutor . . . acts as a complaining witness in support of a warrant application." (internal citation omitted)).

Therefore, the Court finds the Defendant's argument as to absolute immunity unavailing. Regardless, the Court need not make a finding on the issue given that the Court finds that qualified immunity does apply in the next section – which has the same ultimate effect.

### 2.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To be protected by qualified immunity, the government official must first demonstrate that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Garcia v. Casey*, 75 F.4th

1176, 1185 (11th Cir. 2023) (citing *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016));

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). "Once it has been determined

that an official was acting within the scope of his discretionary authority, the burden shifts to the

plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185 (quotation

omitted).

The first inquiry may be a mixed question of law or fact, but the second inquiry is purely a

question of law. *Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020). "Both elements of this

test must be present for an official to lose qualified immunity, and this two-pronged analysis may

be done in whatever order is deemed most appropriate for the case." *Brown v. City of Huntsville*,

608 F.3d 724, 734 (11th Cir. 2010) (citing *Pearson*). If a plaintiff fails to establish either one, then

the defendant is entitled to qualified immunity.

An officer acts within his discretionary authority when his behavior is "(1) undertaken

pursuant to the performance of his duties, and (2) within the scope of his authority." *Est. of

Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l, Inc. v. James*,

157 F.3d 1271, 1282 (11th Cir. 1998)); *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995).

"Our inquiry is two-fold. We ask whether the government employee was (a) performing a

legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were

within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th

Cir. 2004) (citation omitted). "In applying each prong of this test, we look to the general nature

of the defendant's action, temporarily putting aside the fact that it may have been committed for

an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under

constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th

Cir. 2017) (quoting *Holloman*, 370 F.3d at 1266). Therefore, an officer may still be acting within

his discretionary authority even if/when violating the constitution. The relevant analysis is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations and internal quotations omitted).

Courts utilize a two-part framework to evaluate qualified immunity claims. *Castle v. Appalachian Tech. College*, 631 F.3d 1194, 1197 (11th Cir. 2011). The first element is whether the plaintiff's allegations, if true, establish a constitutional violation. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second element is whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. at 232. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Garcia*, 75 F.4th at 1185 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U. S. 335, 341 (1986). As to the second prong of the analysis, courts "recognize three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert v. Lee County.*, 510 F.3d 1312, 1330 (11th Cir. 2007). Courts will also look beyond caselaw to whether the case at hand is one of "obvious clarity" – i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official],

notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)). In such situations where it is so obvious, courts have repeatedly held that the constitutional violation is clearly established even though there is no decision in a "materially similar preexisting case." *Cantu*, 974 F.3d at 1235 (citations and internal quotations omitted). That said, "the clearly established law standard is a demanding one." *Id*. (citing *Wesby*, 583 U.S. at 63; *City & Cnty. of San Francisco. v. Sheehan*, 575 U.S. 600 (2015)).

### 1.    Malicious Prosecution

To prove a Fourth Amendment malicious-prosecution claim in our Circuit, a plaintiff must establish four elements: (1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process. *See* [*Butler v. Smith*, 85 F.4th 1102,] 1111–12 [(11th Cir. 2023)] (outlining the relevant elements and how they merge); *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (identifying a simplified two-step test that breaks down into these elements).

*Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025).

The Supreme Court has explained that "[i]n American courts as of 1871, the malicious prosecution tort generally allowed recovery against an individual who had initiated or caused the initiation of criminal proceedings despite having 'no good reason to believe' that criminal charges were 'justified by the facts and the law.'" *Thompson* [*v. Clark*], 596 U.S. [36,] 43 [(2022)] (quoting THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 180 (Chi., Callaghan & Co. 1879)). During that period, a plaintiff could state a claim for malicious prosecution by showing three elements: "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution 'terminated in the acquittal or discharge of the accused.'" *Id*. at 44 (quoting COOLEY, *supra*, at 181).

Our precedent incorporates these three elements into a modern claim for violation of the Fourth Amendment's guarantee of security against unreasonable seizures. But because Section 1983 incorporates the element of common-law torts only "so long as doing so is consistent with 'the values and purposes of the constitutional right at issue,'" *id*. at 43 (quoting *Manuel* [*v. City of Joliet*], 580 U.S. [357,] 370

[(2017)])—here, a Fourth Amendment violation—we combine the Fourth Amendment's constitutional elements with those of a traditional malicious-prosecution tort, *see Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (explaining that because "the claim is a mashup of sorts," plaintiffs must meet both the Fourth Amendment's requirements and those of the common-law tort of malicious prosecution). So a plaintiff must also prove that he was seized "pursuant to the legal process," *Heck v. Humphrey*, 512 U.S. 477, 484 [ ] (1994), "that the legal process justifying his seizure was constitutionally infirm," and "that his seizure would not otherwise be justified without legal process," *Williams* [*v. Aguirre*], 965 F.3d [1147,] 1165 [(11th Cir. 2020)].

In practice, though, a malicious-prosecution claim's common-law elements meld with the Fourth Amendment's textual components because a "significant overlap" exists between them. *Luke v. Gulley* ("*Luke I*"), 975 F.3d 1140, 1143 (11th Cir. 2020). For instance, "[i]f a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause." *Id.* at 1144. So the questions whether a defendant instituted or continued a legal proceeding with malice and without probable cause "effectively merge[]" with our case law on unconstitutional seizures. *Butler*, 85 F.4th at 1112.

*Id.* at 1247-48.

### a.    Discretionary Authority

There is no dispute that Lott acted within his discretionary authority when he investigated the events of this matter then obtained an arrest warrant for Thomas. *See generally Whiting v. Traylor*, 85 F.3d 581, 585 (11th Cir. 1996) ("Obtaining an arrest warrant is one of the initial steps of a criminal prosecution.").

### b.    Probable Cause or Arguable Probable Cause

"[T]he law requires that a warrant for an arrest be supported by sufficient information to establish probable cause." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (citations and internal quotation marks omitted). "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity." *Washington v. Durand*, 25 F.4th 891, 902 (11th

Cir. 2022) (quotation and internal modifications omitted). "Although 'an arrest made without probable cause violates the Fourth Amendment,' an officer is entitled to qualified immunity if he has 'arguable probable cause.'" *Badia*, 47 F.4th at 1181 (11th Cir. 2022) (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)); *see also Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (also discussing that an officer need not have actual probable cause, but only arguable probable cause).

> An officer has arguable probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." [*District of Columbia v.* ]*Wesby*, 138 S. Ct. [577,] 593 [(2018)]. An officer lacks arguable probable cause only if "the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington* [*v. Howard*], 25 F.4th [891,] 903 [(11th Cir. 2022)] (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

*Garcia*, 75 F.4th at 1186.

The Court will analyze whether Lott had probable, or arguable, cause to seek a warrant for Thomas for the separate charges of domestic violence, second degree, for intimidating a witness and domestic violence, third degree, for harassment.

### i.    Domestic Violence, Second Degree – Intimidating a Witness

Under Alabama law:

> A person commits the crime of domestic violence in the second degree if the person commits . . . the crime of intimidating a witness pursuant to Section 13A-10-123 . . . and the victim is . . . any person with whom the defendant has a child in common, a present household member, or a person who has or had a dating relationship with the defendant.

ALA. CODE § 13A-6-131(a)(1).

A person commits the crime of intimidating a witness if he attempts, by use of a threat directed to a witness or a person he believes will be called as a witness in any official proceedings, to:

> (1) Corruptly influence the testimony of that person;
> (2) Induce that person to avoid legal process summoning him to testify; or
> (3) Induce that person to absent himself from an official proceeding to which he has been legally summoned.

ALA. CODE § 13A-10-123(a)(1)-(3). A "threat" means "any threat proscribed by [Ala. Code §] 13A-6-25 on criminal coercion." ALA. CODE § 13A-10-123(b).

> A person commits the crime of criminal coercion if, without legal authority, he threatens to confine, restrain or to cause physical injury to the threatened person or another, or to damage the property or reputation of the threatened person or another with intent thereby to induce the threatened person or another against his will to do an unlawful act or refrain from doing a lawful act.

ALA. CODE § 13A-6-25(a).

> The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause. *Franks v. Delaware,* 438 U.S. 154 [ ] (1978). "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Id.* at 164–65 [ ] (citation omitted) (emphasis in original). While this condition does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165 [ ]. Thus, a police officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information. *See Malley v. Briggs,* 475 U.S. 335, 346 [ ] (1986); [*Jones v.*] *Cannon,* 174 F.3d [1271,] 1285 [(11th Cir. 1999)]. If "a reasonable police officer would have known that [Rolfe's] testimony was not just negligently false, but recklessly so," then Rolfe is not entitled to qualified immunity. *Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994).

*Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003).

Here, while Thomas' assault charge was pending, he contacted Butts, with whom he was in an on-and-off again dating relationship, and, according to Lott's report, communicated to her "I'll beat the fuck out of you, you better not switch up on me, you better not snitch on me." Lott's report states Thomas' statement to Butts was in regard to her potential testimony in his pending

assault case.  Herren does not dispute Lott's report as to that fact, and Lott believed Butts'

statements to be credible when they were stated.  At Butts' deposition, she stated she did not use

the word "snitch," and the statement was in regard to her relationship with Isaiah, a fact she does

not state she clarified for Herren and Lott at any time prior to her deposition.  However, at the

preliminary hearing for Thomas' domestic violence, second degree, charge, which occurred prior

to Butts' deposition in this matter and closer in time to when she was interviewed by Herren and

Lott, she agreed Thomas made the statement, used the word "snitch," and made the statement

multiple times.

> Further:

> In malicious prosecution the general rule is that the finding of an indictment by a
> grand jury against one charged with crime is prima facie evidence of the existence
> of probable cause, and that the acquittal of a defendant upon the trial does not tend
> to show a want of probable cause for believing him guilty of the offense charged
> when the arrest is made or prosecution initiated . . . .

*Ala. Power Co. v. Neighbors*, 402 So. 2d. 958 (1981) (quoting *Union Indem. Co. v. Webster*, 118

So. 794 (Ala. 1928)).  "This prima facie showing of the existence of probable caused created by

an indictment by a grand jury can be overcome by a showing that the *indictment* was 'induced by

fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the

indictment.'"  *Smith v. Wendy's of the S., Inc.*, 503 So. 2d 843, 844 (Ala. 1987) (emphasis in

original) (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133, 140 (Ala. 1983)).

A grand jury returned an indictment against Thomas for the charge of domestic violence,

second degree, and the Court finds Thomas has not shown Lott induced the indictment for the

charge by either fraud, subornation, suppression of testimony, or other like misconduct.  Based on

Butts' purported statement to Herren and Lott as well as her testimony at the preliminary hearing

that confirmed the statement that was made to Herren and Lott, the Court finds Lott had probable

cause to seek a warrant for Thomas' arrest for domestic violence, second degree, for intimidating a witness. Lott then certainly meets the lower standard for arguable cause.

Therefore, Thomas cannot show the legal process that justified his seizure for domestic violence, second degree, was constitutionally infirm to prove his malicious prosecution claim and, in turn, cannot show Lott violated his constitutional rights to prove Lott is not entitled to qualified immunity. Accordingly, Lott is entitled to qualified immunity as to the malicious prosecution claim for the charge of domestic violence, second degree.

### ii.    Domestic Violence, Third Degree - Harassment

Under Alabama law:

> A person commits domestic violence in the third degree if the person commits . . . the crime of harassment pursuant to subsection (a) of [Ala. Code §] 13A-11-8 . . . and the victim is . . . any person with whom the defendant has a child in common, a present household member, or a person who has or had a dating relationship with the defendant.

ALA. CODE § 13A-6-132(a)(1).

> A person commits the crime of harassment if, with the intent to harass, annoy, or alarm another person, he or she either:
>
> a.    Strikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact.
> b.    Directs abusive or obscene language or makes an obscene gesture towards another person.

ALA. CODE § 13A-11-8(a)(1).

Here, Lott's report states Butts, with whom Thomas was in the on-and-off again dating relationship, stated Thomas grabbed her by the hair and pulled her across a couch to him. Herren reviewed Lott's report and does not dispute the account of Butts' statement about the altercation. Lott believed Butts' statements to be credible when they were stated. Later, Butts stated at her deposition, which occurred after Thomas' domestic violence, third degree, charge was dismissed,

Thomas grabbed her by her shoulders during an argument but did not pull her hair or pull her across the couch. Butts described Thomas as being rough. Based on Butts' purported statement during the interview, the Court finds Lott had probable cause to seek a warrant for Thomas' arrest for domestic violence, third degree, for harassment and certainly meets the lower standard for arguable cause.

Therefore, Thomas cannot show the legal process that justified his seizure for domestic violence, third degree, was constitutionally infirm to prove his malicious prosecution claim and, in turn, cannot show Lott violated his constitutional rights to prove Lott is not entitled to qualified immunity. Accordingly, Lott is entitled to qualified immunity as to the malicious prosecution claim for the charge of domestic violence, third degree, and his motion for summary judgment as to Thomas' malicious prosecution claim is granted.

**B.    State-Law Claim**

**1.    Outrage/Intentional Infliction of Emotional Distress**

"[T]he tort of outrage is the same cause of action as intentional infliction of emotional distress." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017) (quoting *Thomas v. Williams*, 21 So. 3d 1234, 1237 (Ala. Civ. App. 2008)).

> For a plaintiff to recover under the tort of outrage, she must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990). The conduct complained of must "be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

This Court has previously recognized the tort of outrage in three circumstances:

> "The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods

employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).  *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed. 1996)."

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). . . . [T]his Court has <u>not</u> held that the tort of outrage can exist in <u>only</u> those three circumstances:

> "<u>That is not to say, however, that the tort of outrage is viable in only the three circumstances noted in *Potts*</u>.  Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction.  *See O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011).  It is clear, however, that the tort of outrage is viable only when the conduct is '"so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."'  *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010) (quoting [*American Road Service Co. v.*] *Inman*, 394 So. 2d [361, 365 (Ala. 1980)])."

*Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011) (emphasis added).

*Wilson*, 266 So. 3d at 676-77.

Based on the Court's previous finding that Lott had probable, or at least arguable, cause to seek a warrant for Thomas for the domestic violence, second and third degree, charges, the Court finds Lott's conduct does not rise to the level of conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Wilson*, 266 So. 3d at 677 (citations omitted).

Accordingly, Lott's motion for summary judgment as to Thomas' outrage claim is granted.

## V.    CONCLUSION

The motion for summary judgment (Doc. 54) is **GRANTED**, and Plaintiff Thomas Lamar Rone's claims that he brings against Defendant Alex Lott are **DISMISSED with prejudice**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this 10th day of February 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE